**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

MISC. NO. 19-3767JO

FILED BY _____ D.C.

OCT 31 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

IN RE: SEALED
CRIMINAL COMPLAINT
_____ /

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Northern Region of the United
    States Attorney's Office prior to October 14, 2003? _____ Yes    _X_ No

2.  Did this matter originate from a matter pending in the Central Region of the United States
    Attorney's Office prior to September 1, 2007? _____ Yes    _X_ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By: _____

MICHAEL THAKUR
Assistant United States Attorney
Court Number A5501474/
Florida Bar No. 1011456
99 Northeast 4th Street
Miami, Florida 33132-2111
(305) 961-9361
michael.thakur@usdoj.gov

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. 19- 3767 JJO |
| | ) | |
| | ) | |
| Houssam Hachem, | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___2013 through present___ in the county of ___Miami-Dade___ in the ___Southern___ District of ___Florida___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h); 31 U.S.C. §§ 5324(a)(3) 5324(d)(1) and (2); and 18 U.S.C. § 2. | Conspiracy to Commit Money Laundering; and Structuring Transactions to Avoid Reporting Requirements. |

This criminal complaint is based on these facts:

-SEE ATTACHED AFFIDAVIT-

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Daniel McNamara, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___10/31/19___

_____
*Judge's signature*

City and state: ___Miami, Florida___

Hon. John J. O'Sullivan, U.S. Magistrate Judge
*Printed name and title*

19-3767 JJO

# AFFIDAVIT

Your Affiant, Daniel McNamara, being duly sworn, deposes and states:

1.   I am a Special Agent with the Drug Enforcement Administration (DEA). I have been a Special Agent for over three years, and I have been employed by the DEA for six years. Prior to becoming a Special Agent, I was an Intelligence Analyst for the DEA.  I have received specialized training on the subject of narcotics trafficking and money laundering from the DEA and have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions.

2.   This affidavit is submitted in support of a criminal complaint against Houssam HACHEM. As explained below, I respectfully submit that there is probable cause to believe that HACHEM engaged in a conspiracy to commit money laundering, based on the specified unlawful activity of operating an unlicensed money transmitter business, in violation of Title 18, United States Code, Section 1960, all in violation of Title 18, United States Code, Section 1956(h); and did knowingly and for the purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a), and any regulation promulgated thereunder, structure and assist in structuring, transactions, that is, cash deposits into HACHEM's bank account, in violation of Title 31, United States Code, Sections 5324(a)(3) and 5324(d)(1) and (2), and Title 18, United States Code, Section 2.

3.   Under Title 18, United States Code, Section 1960, it is unlawful for anyone to knowingly conduct, control, manage, supervise, direct, or own all or part of an unlicensed money transmitting business. The term "money transmitting" "includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations

abroad by wire, check, draft, facsimile, or courier." 18 U.S.C. § 1960(b)(2). The term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and which fulfills at least one of the three other listed requirements: (1) "is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;" (2) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or (3) "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." Section 5330 defines a "money transmitting business" as a business that: (A) provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system; (B) is required to file reports under section 5313; and (C) is not a depository institution (as defined in section 5313(g)). *Id.* at § 5330(d)(1).

4.   The following information is based upon my personal knowledge and information that has been provided to me by other law enforcement officers.  Because this affidavit is being submitted for the limited purpose of establishing probable cause for a criminal complaint, I have not included each and every fact known to me or other law enforcement officers concerning this investigation.

**PROBABLE CAUSE**

5.   From at least as early as 2013 through the present, HACHEM conspired with money launderers in South America, the United States, and elsewhere to facilitate the illicit movement of money through his bank accounts and his cell phone businesses, HWGK Enterprises, Simple Wireless, and Class Wireless, all located in Michigan. Neither HACHEM, nor any of his co-conspirators, had a license, as required by law, to operate a money transmitter business in the State of Florida or elsewhere in the United States.

6.   HACHEM received millions of dollars in third-party wires sent by intermediaries he knew were engaging in money transmitting for a fee, unrelated to the sale or purchase of goods from HACHEM, to obscure the true origin of the funds. HACHEM and his co-conspirators created false invoices to conceal the fact that no legitimate goods were being sold to the third-party companies or entities from which HACHEM was receiving money.

**Money laundered through FARHAT network**

7.   One of HACHEM's principal co-conspirators was Nader Mohamad FARHAT, the leader of an extensive money laundering organization in the Tri-Border Area of South America, a region where the borders of Brazil, Argentina and Paraguay converge. FARHAT was charged by Superseding Indictment with conspiracy to commit money laundering and substantive money laundering counts in the Southern District of Florida in case number 17-20865-CR-Ruiz(s) and was also charged with money laundering in the Eastern District of New York in case number 18-cr-292. FARHAT was arrested in Paraguay on or about May 17, 2018, and was extradited to the United States in June 2019. FARHAT's cases are currently pending in both districts.

8.   The FARHAT investigation began in or around 2013, when a Mexico-based money launderer instructed a DEA confidential source (hereinafter "CS1") to deliver over $500,000 in

cash that had been picked up in Detroit, minus commission, to a FARHAT associate in Miami, Florida.  As a result, DEA began an undercover investigation into FARHAT and his network. As part of that investigation, from 2014 to 2015, approximately $600,000 in purported drug proceeds were delivered to FARHAT or persons directed by FARHAT to receive funds on his behalf in South Florida and Paraguay. During a recorded meeting at FARHAT's business, Unique Cambios, in Ciudad Del Este, Paraguay in September 2015, CS1 told FARHAT that the CS works with "narco money" and that "all the money is laundered." FARHAT proposed that CS1 receive cash in Miami - a million dollars every 15 days.  FARHAT said that he charges 1.5% for money leaving from Ciudad Del Este; 2% for money leaving from Asuncion, Paraguay; and 3.5% for cash received in the United States or Brazil.  The money would be routed to China or the United States. FARHAT and CS1 discussed where FARHAT could receive cash outside of the United States and Paraguay, and FARHAT mentioned Dubai and Lebanon.  An undercover agent (hereinafter "UC"), posing as an associate of CS1, subsequently delivered $250,000 in $100 bills to FARHAT in a black backpack.  FARHAT opened the bag and quickly counted the bundles of U.S. currency handed to him. FARHAT then wired the money from Brazil to the UC account in installments.

9.   In December 2015, again at the direction of the DEA, CS1 contacted FARHAT to deliver $125,000 in Miami, Florida for FARHAT to launder the purported drug proceeds for CS1. On December 14, 2015, FARHAT provided CS1 the name and phone number of a co-conspirator in South Florida named Diya SALAME as the person to receive the delivery of cash in Miami. That same day, a DEA UC handed SALAME a blue bag with $125,000 in $100 bills in the parking lot of a bar/restaurant in Doral, Florida.  After CS1 confirmed to FARHAT that the money had been delivered, FARHAT sent two wires totaling $121,250 to a DEA UC account.

**Money transmitter emails between HACHEM and FARHAT**

10.     Based on a search warrant obtained in 2014 on FARHAT's dieselhd2011@hotmail.com e-mail account, law enforcement agents found communications between FARHAT and an email account, later identified as belonging to HACHEM, that indicated HACHEM was facilitating illicit money transfers for FARHAT.

11.   The emails between HACHEM and FARHAT contained ledgers showing deposits, withdrawals, and account balances and communications regarding the timing of wire transfers and what names to add to the wires. For example, HACHEM sent FARHAT an attachment with a ledger that contained a running tally of deposits made from January 7, 2013, to September 9, 2014, and the amount of commission charged on the money received, under a column labeled "Commission," with seemingly no additional profit from the transactions other than the commission.

12.   Based on my training and experience both with the methods used by the conspirators in this case and other money laundering investigations, such a ledger reflects accounting for money laundering activities, particularly because there would be no reason for HACHEM to charge a percentage commission for receiving money from various entities and accounts if he were engaged in the legitimate business of selling cell phones.

13.   The emails between HACHEM and FARHAT also detailed numerous third-party accounts through which money was wired to HACHEM. Such third-party money movements is further evidence of trade-based money laundering because it adds a layer of protection or security to conceal the source and owner of the money. For example, on September 19, 2014, HACHEM sent FARHAT an email entitled "Wire update," in which HACHEM stated, "Can you please let me know how much you wired or how much you going [. . .] Youssef gonna ship him 900 pcs*

57$ I will double check and about 750* 44$ But need something please. I have to pay 100k by Monday so I can ship." On September 23, 2014, HACHEM requested that FARHAT send "TTF," which is an apparent reference to an invoice or receipt to justify the wire transfer. A few minutes later, HACHEM sent FARHAT another email, with the subject line "shipping Youssef," and stated, "I need to conf[i]rm Youssef order for today before I ship." In that email, HACHEM included the names of several phones to be shipped. FARHAT then sent a $95,200 wire transfer from a third-party account in Brazil to HACHEM's company, Class Wireless.

14. On or about October 27, 2014, HACHEM sent another email to FARHAT, and stated, "Please send 70k to this account." HACHEM provided the name of a wireless wholesale company in Michigan and FARHAT replied, "need company address."

15. Based on a search warrant authorized in June 2018 by U.S. Magistrate Judge Edwin Torres, agents searched FARHAT's iPhone obtained during his arrest. In FARHAT's phone, agents found WhatsApp messages between FARHAT and a money transmitter in Hong Kong discussing sending HACHEM money. In particular, on December 16, 2016, FARHAT tells the Hong Kong money transmitter, "10k from houssam. Tell him pls." The Hong Kong money transmitter responds, "Ok. U send now?" On May 16, 2017, the Hong Kong money transmitter stated in a WhatsApp audio message that "Detroit Houssam" asked that FARHAT send the Hong Kong money transmitter "$3,000 extra" for money that HACHEM owed on his balance. The next day, on May 17, 2017, the Hong Kong money transmitter sent FARHAT a WhatsApp message asking, "Can you help to take from USA houssam 3000usd?" FARHAT responded, "Yes I can."

**Deposits from companies having no legitimate business with HACHEM**

16. Among the third-party wires that HACHEM received that were unconnected to any sales of goods were more than $450,000 in wires from construction and flooring companies in the

United States that, based on law enforcement surveillance and attempted interviews, do not appear to be engaged in any legitimate business. In the case of one purported construction company located in New Jersey, the owner of the account admitted to law enforcement that he was paid by another person to use his bank account to transmit money and therefore conducted no legitimate business with HACHEM. This construction company's account sent three deposits to HACHEM's Simple Wireless account in December 2016, totaling $65,000. A similar pattern of deposits from other sham companies was discovered for other businesses related to HACHEM's co-conspirators in Miami and elsewhere. In total, over $5.5 million has been identified as originating from "construction" company payments to businesses identified in this investigation as belonging to HACHEM or his co-conspirators.

17.  HACHEM also received deposits into his account from other companies that, based on a review of messages and business records related to HACHEM, did not conduct any legitimate business with HACHEM. For example, HACHEM received numerous, round number deposits from two wig companies in New York (hereinafter, "Wig Company 1" and "Wig Company 2") that are indicative of a money laundering scheme, as shown in the chart below:

| Company transmitting money | Date of deposit into HACHEM account | Amount of deposit into HACHEM account |
|---|---|---|
| Wig Company 1 | November 21, 2016 | $7,000 |
| Wig Company 1 | December 14, 2016 | $7,520 |
| Wig Company 2 | August 28, 2017 | $6,845 |
| Wig Company 2 | October 11, 2017 | $7,763 |
| Wig Company 1 | January 16, 2018 | $15,000 |
| Wig Company 1 | February 9, 2018 | $15,000 |

| Wig Company 1 | February 13, 2018 | $5,000 |
|---|---|---|
| Wig Company 2 | February 15, 2018 | $10,709 |
| Wig Company 2 | March 6, 2018 | $2,260 |
| Wig Company 2 | March 19, 2018 | $6,161 |
| Wig Company 1 | March 26, 2018 | $10,000 |
| Wig Company 1 | April 19, 2018 | $7,500 |
| Wig Company 1 | April 23, 2018 | $8,805 |
| Wig Company 2 | May 7, 2018 | $10,850 |
| Wig Company 1 | May 29, 2018 | $10,000 |
| Wig Company 1 | December 7, 2018 | $10,000 |
| Wig Company 1 | December 7, 2018 | $10,000 |

18.  HACHEM also received large, round number deposits from a translation company in South Florida (hereinafter, "Translation Company 1") that was unrelated to HACHEM's cell phone businesses and, therefore, indicative of money transmitting, as shown in the chart below:

| Company transmitting money | Date of deposit into HACHEM account | Amount of deposit into HACHEM account |
|---|---|---|
| Translation Company 1 | November 04, 2016 | $12,800.00 |
| Translation Company 1 | December 14, 2016 | $20,000.00 |
| Translation Company 1 | May 02, 2017 | $60,000.00 |
| Translation Company 1 | July 10, 2017 | $40,000.00 |
| Translation Company 1 | July 31, 2017 | $45,000.00 |
| Translation Company 1 | October 10, 2017 | $10,000.00 |
| Translation Company 1 | December 11, 2017 | $40,000.00 |

| Translation Company 1 | December 14, 2017 | $45,000.00 |
| Translation Company 1 | December 21, 2017 | $60,000.00 |
| Translation Company 1 | December 27, 2017 | $50,000.00 |
| Translation Company 1 | December 28, 2017 | $16,000.00 |
| Translation Company 1 | February 02, 2018 | $40,000.00 |
| Translation Company 1 | March 05, 2018 | $40,000.00 |
| Translation Company 1 | March 28, 2018 | $50,000.00 |
| Translation Company 1 | May 02, 2018 | $45,000.00 |
| Translation Company 1 | May 07, 2018 | $50,000.00 |
| Translation Company 1 | May 09, 2018 | $50,000.00 |
| Translation Company 1 | July 06, 2018 | $40,000.00 |
| Translation Company 1 | August 29, 2018 | $40,000.00 |
| Translation Company 1 | September 06, 2018 | $20,000.00 |
| Translation Company 1 | August 29, 2018 | $40,000.00 |
| Translation Company 1 | September 06, 2018 | $20,000.00 |

**Structured cash deposits**

19.   HACHEM received numerous structured cash deposits into his bank account. For example, from February 4, 2015, through November 9, 2015, 165 cash deposits totaling $1,032,935 were made to HACHEM's Simple Wireless's Bank of America account.  All of the cash deposits were for amounts less $10,000.  Conducting cash transactions in amounts less than $10,000 is noteworthy because banks are required to report the identity of persons conducting cash transactions greater than $10,000. From July 16, 2014, through August 11, 2014, HACHEM's HWGK Enterprise Inc dba Class Wireless received nine cash deposits totaling $72,000 and all in

9

amounts of $10,000 or less.  Six of the deposits were made in Massachusetts and three were made in Nevada.  To illustrate the volume and type of structured cash deposits that HACHEM routinely received, below is a chart that shows the cash deposits into Simple Wireless from just one month:

| Date of cash deposit | City and State of Cash Deposit | Amount of cash deposit |
|---|---|---|
| February 4, 2015 | Medford, MA | $9,000.00 |
| February 5, 2015 | Medford, MA | $4,000.00 |
| February 5, 2015 | Medford, MA | $8,900.00 |
| February 10, 2015 | Medford, MA | $9,000.00 |
| February 11, 2015 | Somerville, MA | $8,500.00 |
| February 12, 2015 | Medford, MA | $9,000.00 |
| February 13, 2015 | Somerville, MA | $9,300.00 |
| February 17, 2015 | Detroit, MI | $1,055.00 |
| February 20, 2015 | Medford, MA | $9,500.00 |
| February 23, 2015 | Medford, MA | $9,450.00 |
| February 24, 2015 | Medford, MA | $9,225.00 |
| February 25, 2015 | Somerville, MA | $9,800.00 |
| February 26, 2015 | Medford, MA | $9,750.00 |
| February 27, 2015 | Medford, MA | $9,625.00 |

## CONCLUSION

20.  Based on the foregoing, I submit there is probable cause to believe that Houssam HACHEM conspired to commit money laundering, based on the specified unlawful activity of operating an unlicensed money transmitter business, in violation of Title 18, United States Code, Section 1960, all in violation of Title 18, United States Code, Section 1956(h); and did knowingly

and for the purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a), and any regulation promulgated thereunder, structure and assist in structuring, transactions, that is, cash deposits into HACHEM's bank account, in violation of Title 31, United States Code, Sections 5324(a)(3) and 5324(d)(1) and (2), and Title 18, United States Code, Section 2.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
Daniel McNamara, Special Agent
Drug Enforcement Administration

Sworn and subscribed to before
me this 31st day of October 2019.

_____
HON. JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE